No. 23-50194

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**ROBERT ANTHONY ZARAGOZA,**
Plaintiff-Appellant,

v.

**UNION PACIFIC RAILROAD COMPANY,**
**A DELAWARE CORPORATION**
Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Texas, Case No. 3:21-cv-00287-KC
The Honorable Kathleen Cardone

**APPELLEE'S BRIEF**

CONSTANGY, BROOKS, SMITH &
PROPHETE, LLP

Robert L. Ortbals, Jr.
Katie M. Rhoten
680 Craig Rd., Ste. 400
St. Louis, MO 63141
Telephone: (314) 338-3740
Facsimile: (314) 727-1978

Lara C. de Leon
1100 NW Loop 410, Suite 700
San Antonio, TX 78213
Telephone: (512) 382-8800

*Attorneys for Appellee*

## **CERTIFICATE OF INTERESTED PERSONS**

1.    Robert Zaragoza, Plaintiff-Appellant v. Union Pacific Railroad Company, Defendant-Appellee, Appeal No. 23-50194.

2.    The undersigned counsel of record certifies that the following listed persons and entities described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- Union Pacific Railroad Company, Appellee.

- Union Pacific Corporation, a publicly traded corporation and the sole parent of Appellee. No parent corporation or any publicly held corporation owns 10% or more of Union Pacific Corporation's stock.

- Robert L. Ortbals, Jr., Lara C. de Leon, and Katie M. Rhoten of Constangy, Brooks, Smith & Prophete, LLP, Counsel for Appellee.

- Robert Zaragoza, Appellant.

- Lucas J. Kaster and James H. Kaster of Nichols Kaster, PLLP; Anthony S. Petru and Gavin S. Barney of Hildebrand, McLeod & Nelson, LLP; Linnet Rose Davis-Stermitz, Jessica Garland, and Matthew Wessler of PLLC, Counsel for Appellant.

*/s/ Robert L. Ortbals, Jr.*

Attorney of Record for Appellee

## STATEMENT REGARDING ORAL ARGUMENT

Union Pacific requests 15 minutes of oral argument. Oral argument will assist this Court as the issue raised addresses whether Zaragoza's claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA") were subject to tolling under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 541-44, 560-61 (1974). Oral argument will also assist this Court in considering the undisputed factual evidence presented at summary judgment demonstrating Union Pacific's entitlement to judgment as a matter of law.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS.............................................II

STATEMENT REGARDING ORAL ARGUMENT .............................................. III

STATEMENT OF THE ISSUES ......................**ERROR! BOOKMARK NOT DEFINED.**

STATEMENT OF THE CASE ...................................................................2

    The Parties ..........................................................................................2

    The Applicable FRA Regualtions...................................................3

    Union Pacific's Previous CVFT ......................................................6

    The 2012 Goodwell, Oklahoma Collission and NTSB Investigation ............6

    The FRA's 2015 Publications..........................................................7

    Union Pacific's Light Cannon CVFT ............................................9

    Zaragoza's Failed Color Vision Exams in 2010, 2013, and 2016.................13

    Zaragoza's Lawsuit Against Union Pacific ..................................16

    Union Pacific's Summary Judgment Motion and the *Harris* Class Action ..18

    Union Pacific's Previous CVFT ......................................................6

SUMMARY OF THE ARGUMENT ....................................................21

ARGUMENT .......................................................................................23

    Standard of Review..........................................................................23

    I. The district court properly granted summary judgment finding Zaragoza's ADA claims for disparate treatment and disparate impact are time-barred..............................................................................23

        A. *American Pipe* Tolling........................................................24

B. *American Pipe* tolling ceases when named plaintiffs in a class action narrow the class definition ...................................................................26

C. Zaragoza was not within the narrowed class on which the *Harris* plaintiffs moved for certification..........................................................29

D. Zaragoza has not shown the district court erred................................33

II. The Court should affirm summary judgment on the other bases on which Union Pacific so moved ..............................................................38

A. Standard of review ...........................................................................38

B. Zaragoza's disparate treatment claim fails as a matter of law............33

    1. *A fitness-for-duty determination is not direct evidence of discrimination and Zaragoza abandoned the* McDonnell Douglas *framework*......................................................................................39

    2. *Zaragoza was not qualified under the ADA because he could not satisfy the FRA's mandatory color vision standard for recertification* ...............................................................................41

        a. *Union Pacific meets the* Albertson's *defense because it acted under the direction of binding FRA regulations*.................42

        b. *Union Pacific complied with 49 C.F.R. § 242.117(h)(3) in denying Zaragoza's recertification as a conductor and issuing him restrictions* ......................................................45

        c. *Zaragoza's attempts to challenge the Light Cannon test fail*.................................................................................46

C. Zaragoza's disparate treatment impact claim fails as a matter of law..........................................................................................49

CONCLUSION ..................................................................................................52

# TABLE OF AUTHORITIES

## Cases

*Albertson's, Inc. v. Kirkinburg*, 527 U.S. 555 (1999) .................... 42, 43, 44, 45, 51

*American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) ................. *passim*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)....................................23

*Anthony v. TRAX Int'l Corp.*, 955 F.3d 1123 (9th Cir. 2020) ................................42

*Arch of Ky., Inc. v. Dir., Office of Workers' Comp. Programs*, 556 F.3d 472
    (6th Cir. 2009) ...............................................................................................34

*Atkins v. Salazar*, 677 F.3d 667, 681-82 (5th Cir. 2011) ........................................51

*Barryman-Turner v. District of Columbia*,
    115 F. Supp. 3d 126, 133 (D.D.C. 2016)................................................. 33, 34

*Bates v. United Parcel Serv., Inc.*, 511 F.3d 974  (9th Cir. 2007)...........................51

*Bey v. City of New York*, 999 F.3d 157 (2d Cir. 2021) ..................................... 44, 49

*Bower v. Fed. Express Corp.*, 156 F. Supp. 2d 678 (W.D. Tenn. 2001).......... 46, 47

*Bridges v. Dept. of Md. State Police*, 441 F.3d 197 (4th Cir. 2006) ......................34

*Brunskill v. Kansas City Southern Ry. Co.*, No. 06-00205-CV-W-REL,
    2008 WL 413281 (W.D. Mo. Feb. 12, 2008), *aff'd*,
    331 Fed. Appx. 426, 2009 WL 2448265 (8th Cir. 2009) ...................... 46, 47

*Busari-Ibe v. AGS-AECOM Co.*, No. 4:11-CV-625-Y, 2012 WL 12090207, at *3
    (N.D. Tex. Jan. 25, 2012) ............................................................................24

*Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.,* 582 U.S. 497 (2017) .......... 26, 34

*Cannizaro v. Neiman Marcus, Inc.*,
    979 F. Supp. 465, 475 (N.D. Tex. 1997) ............................................... 41 n.3

*Carrillo v. Union Pac. R.R. Co.,* No. EP-21-CV-00026-FM, 2022 WL 3224000, at *4-*5 (W.D. Tex. Aug. 9, 2022) ...................................................................40

*China Agritech, Inc. v. Resh,* 138 S.Ct. 1800 (2018) ..............................................26

*Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019)............39

*Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020)..................39

*Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332 (4th Cir. 2022)......................... 44, 51, 52

*Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983)........................ 25, 29

*Feist v. La., Dep't of Justice, Office of Att'y Gen.,* 730 F.3d 450, 452 (5th Cir. 2013) ...........................................................................................................38

*Ervin v. Sprint Communications Co.,* 364 App'x 114, 116 (5th Cir. 2010)............40

*Fort Bend County v. Davis*, 139 S.Ct. 1843 (2019).................................................24

*Ganousis v. E.I. du Pont de Nemours & Co.*, 803 F. Supp. 149 (N.D. Ill. 1992) .. 28

*Gober v. Frankel Family Trust*, 537 Fed. Appx. 518, 521 (5th Cir. 2013)............41

*Harris v. P.A.M. Transp., Inc.*, 339 F.3d 635 (8th Cir. 2003) .................................44

*Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616 (D. Neb. 2019) ..................... *passim*

*Harris v. Union Pac. R.R. Co.,* 953 F.3d 1030 (8th Cir. 2020) ..............................19

*Hawkins v. Schwan's Home Service, Inc.*, 778 F.3d 877 (10th Cir. 2015) .............44

*Holland v. Florida*, 560 U.S. 631, 649 (2010) .......................................................34

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 293 F.R.D. 483 (S.D.N.Y. 2013).............................................................................................28

*In re Syntex Corp. Sec. Litig.*, 95 F.3d 922 (9th Cir. 1996).............................. 27, 34

*Jones v. Kerrville State Hosp.*, 142 F.3d 263, 265 (5th Cir. 1998) ........................41

*Kitchen v. BASF*, 952 F.3d 247, 252 (5th Cir. 2020) ........................................ 39, 40

*Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877 (9th Cir. 2000) .....................42

*Martin v. Lennox Intern. Inc.*, 342 Fed. Appx. 15, 17 (5th Cir. 2009) ............ 44, 45

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .............................. 39, 40

*McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 456
  (5th Cir. 2019) ........................................................................................ 39, 40

*McNelis v. Pa. Power & Light Co.*, 867 F.3d 411 (3d. Cir. 2017) ................... 44, 52

*Melgar v. T.B. Butler Publ'g Co., Inc.*,
  931 F.3d 375, 378–79 (5th Cir. 2019) .................................................... 23, 24

*Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496 (9th Cir. 1984) .............34

*Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250 (2016) ......... 28, 29

*Montes v. Ransom*, 219 F.App'x 378, 381 (5th Cir. 2007) ....................................32

*Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010) ..........................23

*Myers v. J.B. Hunt Transport., Inc.*, No. 1:05CV00717, 2006 WL 3479001
  (M.D.N.C. Nov. 30, 2006)...............................................................................42

*Montes v. Ransom*, 219 F.App'x 378, 381 (5th Cir. 2007) ....................................32

*Montgomery v. Union Pac. R.R. Co.*,
  848 Fed. Appx. 314, 315 n.2 (9th Cir. 2021) ...............................................50

*Nall v. BNSF Ry. Co.,* 917 F.3d 335, 339, 341 (5th Cir. 2019) .............................40

*Owen v. Union Pac. R.R. Co.*, No. 8:19CV462, 2020 WL 6684504 (D. Neb. Nov.
  12, 2020), *appeal dismissed*, 2021 WL 1977771 (8th Cir. Feb. 4, 2021).....37

*Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003)................................................ 22, 39

*Rodriguez v. Eli Lily & Co.*, 820 F.3d 759, 765 (5th Cir. 2016) ............................39

*Sawtell v. E.I. du Pont de Nemours & Co.*, 22 F.3d 248 (10th Cir. 1994) . 26, 27, 28

*Smith v. Pennington*, 352 F.3d 884, 894 (4th Cir. 2003)........................................28

*Tagore v. United States*, 735 F.3d 324, 327 (5th Cir. 2013) ..................................23

*Weitzner v. Sanofi Pasteur Inc.,* 909 F.3d 604 (3rd Cir. 2018) ..............................26

*Williams v. JB Hunt Trans. Inc.*, 826 F.3d 806 (5th Cir. 2016) ............................ 44

## Statutes

42 U.S.C. § 2000e-5(b) ...........................................................................................24

42 U.S.C. § 12111(8) ...............................................................................................41

42 U.S.C. § 12112(a) ............................................................................................... 38

42 U.S.C. § 12117(a) ...............................................................................................24

42 U.S.C. § 12201(h) ........................................................................... 41 n.3, 51 n.4

## Rules

Fed. R. Civ. P. 56(a)................................................................................................23

## Regulations

29 C.F.R. § 1630.2(m) .............................................................................................41

29 C.F.R. § 1630.15(e)............................................................................... 22, 42, 47

49 C.F.R. § 240.121(c)..............................................................................................8

49 C.F.R. § 240.121(c)(3)..........................................................................................4

49 C.F.R. § 240.207 ................................................................................14

49 C.F.R. Pt. 240 App. F...........................................................................4

49 C.F.R. § 242.1(a)...........................................................................5, 45

49 C.F.R. § 242.3(a) ..................................................................................2

49 C.F.R. § 242.117(h) ............................................................ 4, 8, 45, 46

49 C.F.R. § 242.117(j) ...............................................................................5

49 C.F.R. Pt. 242 App. D ........................................................ 4, 6, 45, 47

*Qualification & Certification of Locomotive Engineers*, 64 Fed. Reg. 60,966,
    60,984 (Nov. 8, 1999)............................................................................4

*Conductor Certification*,
    76 Fed. Reg. 69,802, 69,822, 69,834 (Nov. 9, 2011) ....................................4

*Best Practices for Designing Vision Field Tests for Locomotive Engineers or
    Conductors,* 80 Fed. Reg. 73,122, at 73,124 (Nov. 24, 2015) .....................47

## Other Authorities

Merriam-Webster Dictionary *at*
    https://www.merriam-webster.com/medical/Ishihara%20test
    (last visited May 27, 2023)........................................................................5 n.1

## <u>STATEMENT OF THE ISSUES</u>

1.     Did the district court correctly grant summary judgment in Union Pacific's favor by concluding Zaragoza's disparate treatment and disparate impact claims were time-barred and not saved by class action tolling where Zaragoza did not fall within the operative class definition?

2.     Should the district court's judgment granting summary judgment be affirmed on other grounds where Zaragoza was not a qualified individual under the ADA and Zaragoza cannot prove discriminatory intent?

## STATEMENT OF THE CASE

*The Parties*

Headquartered in Omaha, Nebraska with approximately 30,000 employees, Union Pacific Railroad Company is an interstate Class I freight railroad linking 23 states in the western two-thirds of the U.S. by rail. [ROA.472, ¶¶ 1, 2; ROA.1539, ¶¶ 1, 2]. Union Pacific policy prohibits discrimination, retaliation, and harassment based on disability or any other protected status. [ROA.472, ¶ 2; ROA.1539, ¶ 3].

Robert Zaragoza began working for Union Pacific in November 2006. [ROA.472-473, ¶ 4; ROA.1539, ¶ 4]. He worked as a conductor and brakeman until July 2015 when his employment was terminated for testing positive for cocaine. [ROA.472-473, ¶ 4; ROA.1539, ¶ 4]. His employment was reinstated in September 2015 and he continued to perform work for Union Pacific until April 2016. [ROA.472-473, ¶ 4; ROA.1539, ¶ 4].

As a conductor, Zaragoza held a safety-sensitive position governed by the Federal Railroad Safety Act ("FRSA") and accompanying regulations implemented by the Federal Railroad Administration ("FRA")—which are binding on Union Pacific. [ROA.473, ¶ 5; ROA.1539, ¶ 5; 49 C.F.R. § 242.3(a)]. Zaragoza described a conductor's duties as being "in charge of the train." [ROA.473, ¶ 6; ROA.1539, ¶ 6; ROA.510, 37:5]. He "needed to know whether we had HAZMAT [(hazardous materials)], length of train, weight of train, any track warrants involved in our

2

territory. Track bulletins. We had maintenance of way working with the limits that we would be working in. Full responsibility, job briefing to the engineer and crew. Placement of HAZMAT." [ROA.473, ¶ 6; ROA.1539, ¶ 6; ROA.510, 37:5-25]. Zaragoza was responsible for making sure the train was put together correctly. [ROA.473, ¶ 6; ROA.1539, ¶ 6; ROA.510, 37:5-25]. It was important for Zaragoza to know the length and weight of the train "[f]or safety of crew and public" because if the train "got signaled into a siding, whether we're gonna fit in that siding, whether we would block any crossing. There's different situations at hand that come along with it." [ROA.473, ¶ 7; ROA.1539, ¶ 7].

Zaragoza was also responsible for reading and calling out colored wayside railroad signals. [ROA.473, ¶ 8; ROA.1539, ¶ 8]. Zaragoza understood that he was required to be able to discriminate the colors in railroad signal displays and meet FRA color vision standards. [ROA.474, ¶ 9; ROA.1539, ¶ 9].

### *The Applicable FRA Regulations*

In 1999, the FRA promulgated Appendix F (Medical Standards Guidelines) to 49 C.F.R. Part 240 (Qualification and Certification of Locomotive Engineers). The appendix's purpose was "to provide greater guidance on the procedures that should be employed in administering the vision and hearing requirements" for locomotive engineer certification and the appendix added "acceptable test methods for determining whether a person has the ability to recognize and distinguish among

the colors used as signals in the railroad industry." The promulgation of Appendix F was in response to a railroad accident and National Transportation Safety Board investigation ("NTSB") in Secaucus, New Jersey involving an engineer with a color vision deficiency. [ROA.474, ¶ 10; ROA.1540, ¶ 10; 49 C.F.R. Pt. 240 App. F; *Qualification & Certification of Locomotive Engineers*, 64 Fed. Reg. 60,966, 60,984 (Nov. 8, 1999)].

In 2011, the FRA issued its final rule for conductor certification—requiring railroads to have a formal program for certifying conductors. The visual acuity requirements adopted for conductor certification were the same as for locomotive engineers. And Appendix D to 49 C.F.R. Part 242 was derived from Appendix F to Part 240 and addresses "acceptable test methods for determining whether a person has the ability to recognize and distinguish among the colors used as signals in the railroad industry." [ROA.474, ¶ 11; ROA.1540, ¶ 11; *Conductor Certification*, 76 Fed. Reg. 69,802, 69,822, 69,834 (Nov. 9, 2011); *compare* 49 C.F.R. § 240.121(c)(3) *with* § 242.117(h)(3); *compare* Pt. 240 App. F *with* Pt. 242 App. D]. This was done to ensure anyone involved in train operations who could not meet the color vision acuity standards could not be certified to operate a train. [ROA.475, ¶ 12; ROA.1540, ¶ 12].

The purpose of the FRA's regulations governing conductor certification is to ensure that only persons who meet minimum Federal safety standards serve as

conductors, to reduce the rate and number of accidents and incidents, and to improve railroad safety. [49 C.F.R. § 242.1(a)]. The FRA requires all conductors to meet certain color vision standards to be certified and recertified to hold these positions. [49 C.F.R. §§ 242.1(a), .117]. Conductors are required to pass a vision acuity examination during their certification and recertification process that tests their ability to recognize and distinguish between the colors of railroad signals. [49 C.F.R. §§ 242.1(a), .3(a), .117(h)(3); Pt. 242, App. D(2)].

The FRA's regulations identify the 14-plate Ishihara test as an acceptable method for determining whether an individual has the requisite ability to recognize and distinguish between the colors used as signals in the railroad industry.[1] [49 C.F.R. Pt. 242, App. D(2)]. If a conductor fails the Ishihara test, FRA regulations allow them to be further evaluated by the railroad's medical examiner utilizing a color vision field test ("CVFT") to determine the individual's ability to safely perform as a conductor or engineer. [49 C.F.R. §§ 242.117(j); Pt. 242, App. D(4)]. FRA regulations do not describe how a CVFT is to be conducted and give the railroad discretion to develop and implement a field test. [49 C.F.R. §§ 242.117(j);

---

[1] The Ishihara test is "a widely used test for color blindness that consists of a set of plates covered with colored dots which the test subject views in order to find a number composed of dots of one color which a person with various defects of color vision will confuse with surrounding dots of color." MERRIAM-WEBSTER DICTIONARY *at* https://www.merriam-webster.com/medical/Ishihara%20test (last visited May 27, 2023).

Pt. 242, App. D(4)]. The FRA's regulations state their intent "is not to provide an examinee with the right to make an indefinite number of requests for further evaluation, but to provide an examinee with at least one opportunity to prove that a … vision test failure does not mean the examinee cannot safely perform as a conductor." [49 C.F.R. Pt. 242, App. D(4)]. A conductor who fails the Ishihara test and the secondary CVFT is not entitled to further medical evaluation regarding their color vision. [49 C.F.R. Pt. 242 App. D(4)].

### Union Pacific's Previous CVFT

In 1999, Union Pacific implemented a CVFT in which an individual was presented with ten wayside signal configurations in a preset order. [ROA.476, ¶ 21; ROA.1541, ¶ 21]. The examiner noted the time it took for the individual to identify each signal and whether they identified each signal correctly. [ROA.476, ¶ 21; ROA.1541, ¶ 21].

### The 2012 Goodwell, Oklahoma Collision and NTSB Investigation

In June 2012, two Union Pacific trains traveling in opposite directions collided head-on in Goodwell, Oklahoma—killing two engineers and one conductor and causing approximately $14.8 million in damage. [ROA.476-477, ¶ 22; ROA.1541, ¶ 22]. The collision derailed five locomotives and 32 cars and several fuel tanks from the derailed locomotives ruptured, releasing diesel fuel that ignited and burned. [ROA.476-477, ¶ 22; ROA.1541, ¶ 22].

6

After its investigation, the NTSB concluded that one of the probable causes of the collision was the eastbound train engineer's inability to see and correctly interpret the colored wayside signals. [ROA.477, ¶ 23; ROA.1541, ¶ 23; ROA.604]. The engineer had failed his Ishihara test in 2009 but was granted his FRA recertification after passing Union Pacific's CVFT that had been in place since 1999. [ROA.477, ¶ 24; ROA.1542, ¶ 24; ROA.581-582]. After conducting its accident investigation and reviewing the CVFT taken by the eastbound engineer, the NTSB concluded Union Pacific's CVFT failed to ensure that its employees had adequate color vision acuity to work in safety-sensitive positions and recommended that Union Pacific replace it. [ROA.477, ¶ 25; ROA.1542, ¶ 25; ROA.582].

### The FRA's 2015 Publications

In March 2015, the FRA published a report affirming that color vision was necessary for certain railroad employees—even if the signals being interpreted were "completely redundant with regard to signal color and signal orientation." [ROA.625-626]. The report also concluded that railroad employees with color vision deficiencies "have a much higher relative error risk than employees with normal color vision (the relative risk of an error is nearly 8,000,000 times higher for individuals with defective color vision)" when interpreting redundant signals. [ROA.625-626].

7

In November 2015, the FRA issued interim guidance in response to the Goodwell collision to clarify the vision testing and certification regulations and qualifications for conductors and engineers. [ROA.478, ¶ 27; ROA.1542, ¶ 27]. As stated in the interim guidance, the "FRA's locomotive engineer and conductor qualification certification rules grant railroad medical examiners discretion in determining the methods and procedures the medical examiner will use to further evaluate persons who do not meet the vision thresholds [of the initial Ishihara test] in 49 C.F.R. §§ 240.121(c) and 242.117(h)."[2] [ROA.478, ¶ 28; ROA.1542, ¶ 28]. Regarding CVFTs, the FRA suggested they (1) be "valid, reliable, and comparable," (2) should "reasonably match actual operating or working conditions," and (3) may be performed while conductors stand "on the ground at distances from a signal or other object that the person must see and recognize to perform safely as a locomotive engineer or conductor." [ROA.478, ¶ 29; ROA.1542, ¶ 29].

The FRA defined "validity, reliability, and comparability" as:

> *Validity* means the degree to which a test actually measures what the test is intended to measure. For example, a color vision field test is valid to the degree it assesses whether a person can recognize and distinguish between colors of the types of railroad signals in the yard or on all portions of railroad systems on which the person must perform safely, depending on the person's

---

[2] Joseph Riley, former Specialist of Operating Crew Management in the FRA's operating practices division, testified: "As far as the follow-up, and field testing, that's based on the discretion of the railroad." [ROA.478, ¶ 28; ROA.1542, ¶ 28; ROA.942, 50:13-51:6].

responsibilities. One way to estimate the validity of a test is to assess its degree of job-relatedness (content validity). The degree to which a field test's conditions match actual operating conditions determines, to a large extent, its validity.

*Reliability* … means an examinee that is repeatedly administered the same test would demonstrate the same number of correct responses and missed signal responses each time the test is administered.

*Comparability* means the testing procedures are fairly administered and the test results are uniformly recorded.

[ROA.478-479, ¶ 30; ROA.1542, ¶ 30]. The FRA included various best practices for railroads administering CVFTs including to: (1) standardize test procedures; (2) have a qualified supervisor conduct the test; (3) ensure the testing officer's vision meets the thresholds; (4) record test results during testing; (5) capture all essential data and void tests with incomplete data; (6) have the test officer affirm that data was accurately recorded; and (7) before the test, inform the examinee of the test's purpose and procedures. [ROA.479, ¶ 31; ROA.1542, ¶ 31]. Other specific recommendations included that the CVFT should not employ a predictable signal sequence and that each signal should be tested multiple times, both of which remove the likelihood of examinees passing with an educated guess. [ROA.479, ¶ 32; ROA.1542, ¶ 32].

***Union Pacific's Light Cannon CVFT***

In response to the NTSB's 2013 Goodwell report and the FRA's 2015 publications, Union Pacific began developing a revised CVFT for its locomotive engineers and conductors. [ROA.480, ¶ 33; ROA.1543, ¶ 33; ROA.652, ¶ 5]. It developed a new test signal device known as the "Light Cannon" to address the issues raised by the NTSB and designed to reasonably match actual operating and working conditions for railroad workers responsible for identifying colored wayside signal lights. [ROA.652, ¶¶ 6-7]. Union Pacific sought to create a CVFT that "would be more representative of the wayside signal lights that were being put on the railroads now, namely LED-based ones." [ROA.994, 59:12-20].

In 2016, Union Pacific implemented a revised CVFT utilizing the Light Cannon and revised testing protocols to comply with the NTSB's and FRA's recommendations. [ROA.480, ¶ 35; ROA.1543, ¶ 35; ROA.652, ¶ 6]. To administer the test, the Light Cannon was placed a quarter mile away from the examinee and (after verifying the device was working properly) the examinee was shown 20 separate signal lights for three seconds each. [ROA.480, ¶ 36; ROA.1543, ¶ 36]. After viewing a signal for three seconds, the nurse administering the test would record the examinee's answer identifying the color of that signal light. [ROA.480, ¶ 36; ROA.1543, ¶ 36]. Union Pacific published procedures for the managers and occupational health nurses administering the Light Cannon. [ROA.480, ¶ 37; ROA.1543, ¶ 37].

The Light Cannon complied with the FRA's suggested best practices by (1) using signals that are substantially similar to those being used in the field; (2) conducting the test at a distance that approximates the distance engineers and conductors need to be able to recognize signals; (3) removing positional cues (like those present in Union Pacific's former CVFT); (4) presenting a proper number of individual signal lights to the examinee, and (5) having written, standardized testing procedures. [ROA.831-832, 141:16-142:20; ROA.1174-1175, 41:8-42:1, 42:25-43:22]. Dr. Douglas Ivan testified the Light Cannon utilized LED lights that "were the same as being fielded on the actual railway" and "was representative of what was being used on the lines." [ROA.1059-1060, 124:25-125:8]. Similarly, Dr. Jeffrey Rabin testified the Light Cannon was "a valid field test which stimulates [employees'] real world demands." [ROA.1624, 38:24-25]. According to Dr. Rabin, Union Pacific "fully fulfilled" all recommendations made before implementing the Light Cannon and "the quarter-mile distance, the lights used, the LED lights used, in the current light cannon test, are exactly what one may experience in the field." [ROA.1633, 74:11-13; ROA.1624, 38:14-19].

After observing the revised CVFT and testing protocol, the FRA also represented it complied with the NTSB and FRA's color-vision testing recommendations. [ROA.787-879, 97:21-98:17; ROA.942-943, 52:5-55:1]. Around 2016, Riley learned about the Light Cannon and "saw nothing that would warrant a

violation of anything." [ROA.482, ¶ 44; ROA.1544, ¶ 44; ROA.935, 22:15-19, 24:1-15; ROA.941, 47:2-48:1]. In 2017, the FRA concluded the Light Cannon field test was "an adequate field test as contemplated by 49 C.F.R. Part 240, Appendix F, paragraph (4)." [ROA.920]. In 2018, the FRA concluded the Light Cannon field test "was in accordance with 49 C.F.R. § 242.117 and 49 C.F.R. Part 242, Appendix D." [ROA.927].

In 2022, Union Pacific's retained expert, Steven Fender, observed the Light Cannon in use. Fender is a railroad transportation and safety consultant with 45 years of railroad industry experience, 31 years of which were at the FRA. Fender served as a principal advisor to the Associate Administrator for Railroad Safety and often represented FRA on regional and national transportation, safety, and security issues. [ROA.482, ¶ 47; ROA.1545, ¶ 47]. Fender found the Light Cannon to be "reasonable and quite effective" and "remarkably similar to reproduction of signal previews as seen from a locomotive." It is his professional view that the Light Cannon "is in compliance with the FRA's Engineer and Conductor Certification Rules, and specifically, the 2015 guidance offered in the Best Practices for Designing Vision Field Tests for Locomotive Engineers or Conductors." Finally, Fender stated, "The Light Cannon field test is a practical, well-developed, and implemented test which replicates real world conditions that train crews encounter on the various railroads, routes, and line segments." [ROA.482-483, ¶ 48; ROA.1545, ¶ 48].

### *Zaragoza's Failed Color Vision Exams in 2010, 2013, and 2016*

As part of his preemployment medical evaluation with Union Pacific, Zaragoza completed a health history form. The form asked whether Zaragoza had color vision weakness or deficiency and he checked "yes." Zaragoza then handwrote an explanation: "Color weakness or deficiency: I had a deficiency but I saw a Doctor and he was able to help me pass the Ishihara test." [ROA.483, ¶ 49; ROA.1545, ¶ 49]. Zaragoza knew that he had a hereditary color vision deficiency. [ROA.483, ¶ 50; ROA.1545, ¶ 50]. Zaragoza passed Union Pacific's preemployment Ishihara test in 2006; but cannot remember if he was wearing a red-colored lens when taking the exam. [ROA.483, ¶ 51; ROA.1545, ¶ 51]. FRA regulations prohibit wearing tinted lenses during the Ishihara test and Zaragoza is aware of this. [ROA.483, ¶ 53; ROA.1545, ¶ 53].

On August 3, 2010, Zaragoza took the Ishihara test and failed—missing 13 out of 14 plates. The test examiner noted that Zaragoza "used contact lenses to performed [sic] Ishihara test … still unable to see plates correctly." [ROA.483, ¶ 52; ROA.1545, ¶ 52]. Zaragoza retook the Ishihara test the following day and passed while wearing a "red tinted contact lens." [ROA.484, ¶ 54; ROA.1545, ¶ 54]. Because he initially failed the Ishihara test, Zaragoza took Union Pacific's previous CVFT and passed. [ROA.484, ¶ 55; ROA.1545, ¶ 55]. Zaragoza again failed the Ishihara test during his FRA recertification in August 2013—missing 13 of 14 plates

without wearing a tinted lens. As a result, Zaragoza then took and passed Union Pacific's previous CVFT. [ROA.484, ¶ 56; ROA.1545, ¶ 56].

On April 8, 2016, Zaragoza underwent vision screening for his FRA recertification and took the Ishihara test. Zaragoza again failed the test, missing 13 of 14 plates. He did not wear a red-tinted lens for the Ishihara because "he ha[d] no problems with the Color Vision Field Test." He was removed from service as a conductor and required to take a CVFT, which was the Light Cannon. [ROA.484, ¶ 57; ROA.1545, ¶ 57]. On April 19, 2016, Union Pacific administered the Light Cannon test to Zaragoza. He failed the test, missing nine of the 20 signals presented. [ROA.484, ¶ 58; ROA.1545, ¶ 58].

Union Pacific's Chief Medical Officer, Dr. John Holland, reviewed the results of Zaragoza's failed Ishihara test and Light Cannon CVFT. Based on his review of these test results, Dr. Holland determined that Zaragoza did not meet the color vision requirements for FRA recertification as a conductor. [ROA.485, ¶ 59; ROA.1545, ¶ 59]. On May 3, 2016, Dr. Holland issued Zaragoza a Notice of Pending Denial of FRA Certification based on Zaragoza's failure to meet the FRA vision standards. The notice explained the Zaragoza's FRA certification as a railroad conductor was pending denial because his "vision examination results indicate[d] you failed to meet the required thresholds for vision pursuant to 49 CFR § 240.207 and/or 49 CFR §

242.117 and the associated regulatory testing guidelines." [ROA.485, ¶ 60; ROA.1545, ¶ 60].

On May 5, 2016, Zaragoza saw his personal optometrist, Dr. Louis McMahon. Dr. McMahon's records show that he gave Zaragoza an Ishihara test and that Zaragoza "SAW NONE OF THE PLATES." As a result, Dr. McMahon was going to order Zaragoza an "x-chrome contact lens so he can pass the color vision test for employment with railroad." [ROA.485, ¶ 61; ROA.1545, ¶ 61]. A week later, Zaragoza returned to Dr. McMahon and took and passed the Ishihara test while wearing the x-chrome lens. [ROA.485, ¶ 62; ROA.1545, ¶ 62]. The same day, Zaragoza faxed the normal Ishihara test results to Union Pacific. But he never told Union Pacific that he needed an x-chrome lens to pass the test. [ROA.485, ¶ 63; ROA.1546, ¶ 63].

On August 17, 2016, Dr. Holland sent a letter to ophthalmologist Dr. David Schecter referring Zaragoza for a comprehensive ophthalmology evaluation to determine if Zaragoza might have some underlying eye condition that contributed to his difficulty in identifying colors of railroad signals as opposed to a hereditary color vision deficiency. The referral letter requested that Dr. Schecter conduct certain color vision tests if he had them available and not to perform any other color vision tests. The tests requested were the Hardy Rand Rittler (HRR 4th edition),

Farnsworth-Munsell 100 Hue Test (FM-100), Anomaloscope testing, and one of three computerized color vision tests. [ROA.486, ¶ 64; ROA.1546, ¶ 64].

On September 6, 2016, Dr. Schecter reported that Zaragoza had taken a passed the Farnsworth D-15 color test—which was not one of the color vision tests requested by Union Pacific. There was no evidence of any eye disease that would impact Zaragoza's color vision. [ROA.486, ¶ 65; ROA.1546, ¶ 65]. After reviewing the reports information from Dr. Schecter, Dr. Holland reaffirmed that Zaragoza did not meet the medical standards for FRA certification as a conductor and that he was restricted from performing jobs requiring recognition of colored railroad signals. [ROA.486, ¶ 66; ROA.1546, ¶ 66].

In 2016, any conductor who was denied recertification by a railroad had 120 days following the denial to file a petition asking the FRA to review the railroad's decision. The FRA delegated initial responsibility for adjudicating these disputes to the Operating Crew Review Board ("OCRB"). [49 C.F.R. §§ 242.501, .503 (2012); ROA.486-487, ¶ 67; ROA.1546, ¶ 67]. Zaragoza did not appeal the denial of his FRA certification to the FRA. [ROA. 487, ¶ 68; ROA.1546, ¶ 68].

### *Zaragoza's Lawsuit Against Union Pacific*

On November 23, 2021, Zaragoza filed a Complaint against Union Pacific under the ADA. [ROA.11]. He alleged that his position as a conductor required him to read and interpret multicolored railroad traffic signal lights on signal masts.

[ROA.15, ¶ 25]. Zaragoza further alleged that he was responsible for train movement and required to be certified by the FRA through color vision testing performed by the railroad. [ROA.12, ¶¶ 2-3]. Accordingly, Zaragoza was required to undergo color vision testing on a periodic basis. [ROA.12, ¶¶ 2-3].

Zaragoza alleged he was able to pass his periodic vision testing before 2016 when Union Pacific used its previous CVFT. [ROA.15-16, ¶ 27]. But after Union Pacific implemented the Light Cannon, Zaragoza failed both the Ishihara test and the Light Cannon, after which Union Pacific issued him "permanent work restrictions" that prohibited him from working as a conductor. [ROA.15-16, ¶ 29].

Based on these allegations, Zaragoza asserted three claims under the ADA: "Disability Discrimination – Disparate Treatment" (Count I); "Disability Discrimination – Disparate Impact" (Count II); and "Failure to Accommodate" (Count III). [ROA.18-21]. December 29, 2021, Union Pacific moved to dismiss Zaragoza's disparate impact and failure-to-accommodate claims on the basis they were time-barred. [ROA.65-85]. The district court partially granted Union's Pacific's motion and dismissed Zaragoza's failure-to-accommodate claim. [ROA.322-335]. In ruling on Union Pacific's motion to dismiss, the district court did not address whether Zaragoza remained a member of the *Harris* class after the district court's class certification order. [ROA.322-335, passim; ROA.453 n.4]. Zaragoza has not appealed that order. [ROA.3452].

17

**Union Pacific's Summary Judgment Motion and the Harris Class Action**

On December 19, 2022, Union Pacific moved for summary judgment on Zaragoza's remaining claims for disparate treatment and disparate impact. [ROA.444-471]. Among its arguments for summary judgment, Union Pacific asserted that Zaragoza's remaining claims were time-barred because tolling of their claims that was provided by the *Harris* class action ceased when the *Harris* named plaintiffs filed their motion for class certification asserting a narrower class definition that excluded Zaragoza. [ROA.452-457].

Union Pacific provided the following evidence regarding the *Harris* class action in its summary judgment motion: On February 19, 2016, Quinton Harris and five other named plaintiffs filed an amended complaint against Union Pacific asserting individual and class claims alleging disability discrimination based on disparate treatment (Count I), disparate impact (Count II), unlawful medical inquiries (Count III), and failure to accommodate under the ADA (Count IV). [ROA.1189-1213]. The amended complaint described the proposed class as:

> Individuals who were removed from service over their objection, and/or suffered another adverse employment action, during their employment with Union Pacific *for reasons related to a Fitness-for-Duty evaluation* at any time from 300 days before the earliest date that a named Plaintiff filed an administrative charge of discrimination to the resolution of this action.

18

[ROA.1205 (emphasis added)]. On August 17, 2018, the named plaintiffs moved for class certification but narrowed the description of the proposed class to:

> All individuals who have been or will be subject to a fitness-for-duty examination *as a result of a reportable health event* at any time from September 18, 2014 until the final resolution of this action.

[ROA.1233 (emphasis added)]. Further, the named plaintiffs only sought class certification with respect to "Count I, ADA disparate treatment, of the Amended Complaint[.]" [ROA.1258]. They did not move for certification on any other counts in the amended complaint—including disparate impact, unlawful medical inquiries, and failure to accommodate. [ROA.1258, *passim*].

On February 5, 2019, the district court granted plaintiffs' motion for class certification. *Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616, 628 (D. Neb. 2019)]. On March 24, 2020, the Eighth Circuit Court of Appeals reversed class certification and ordered the class be de-certified. *Harris v. Union Pac. R.R. Co.,* 953 F.3d 1030, 1035-39 (8th Cir. 2020)].

Based on this evidence, Union Pacific argued that Zaragoza's disparate treatment and disparate impact claims were time-barred because they did not fall within the narrowed class definition, i.e., he was not "subject to a fitness-for-duty examination as a result of a reportable health event." [ROA.452-457].

In opposing summary judgment, Zaragoza argued his claims were timely because (1) the *Harris* plaintiffs' class certification motion did not narrow the

proposed class; (2) even if the class were narrowed, Zaragoza was still a member of the certified class because "reportable health event" does not require a change in health status; and (3) the *Harris* class certification order referenced declarations of plaintiffs with color-vision deficiencies and the class certification notice was sent to a list of current and former Union Pacific employees that included Zaragoza. [ROA.1509-1522].

On February 17, 2023, the district court granted summary judgment in Union Pacific's favor on Zaragoza's disparate treatment and disparate impact claims. [ROA.3418-3431]. This appeal followed. [ROA.3452].

## SUMMARY OF THE ARGUMENT

**I.** The district court correctly found Zaragoza's ADA claims were time-barred. Employees must exhaust their administrative remedies by filing an EEOC charge within 300 days of the alleged discriminatory act. It is undisputed Zaragoza did not do so. Zaragoza contends he was a member of the *Harris* class action and his statutes of limitations was tolled under *American Pipe*. They were not. For three decades, courts have consistently held that when named plaintiffs in a class action narrow the class definition, tolling ceases for those unnamed, potential plaintiffs who no longer fit within the narrowed definition. That is the case here. The *Harris* plaintiffs narrowed the class definition to include individuals "subject to a fitness-for-duty examination as a result of a reportable health event." As it relates to color vision, a "reportable health event" is "a new diagnosis, recent event, or change in a prior stable condition, for … significant vision change in one or both eyes affecting … color vision." Zaragoza did not fall within the narrowed class because he did not experience a "significant vision change" affecting his color vision. Rather, he was subject to a fitness-for-duty evaluation because of his required FRA recertification tests—not as the result of a reportable health event. Thus, the district court correctly concluded that Zaragoza did not fall within the narrowed class and his claim is time-barred.

**II.** The Court should affirm summary judgment on the other bases on which Union Pacific so moved. First, evidence of an employer's "subjective intent to discriminate" is "required in a 'disparate-treatment case.'" *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-53 (2003). But Zaragoza was denied his FRA recertification and not returned to service because he failed his recertification test. Concluding Zaragoza could not be recertified under FRA regulations is not the same as refusing to return him to work because of prejudice against his medical condition. Thus, there is no direct evidence of discrimination. Additionally, Zaragoza abandoned any attempt to prove discriminatory intent through pretext in opposing summary judgment. Second, the ADA protects only "qualified individuals." A qualified individual must satisfy job-related requirements. It is an absolute defense to an ADA claim if an action is "required or necessitated by another Federal law or regulation." 29 C.F.R. § 1630.15(e). Union Pacific's administration of the Ishihara and Light Cannon tests was necessitated by FRA regulations. By failing those tests, Zaragoza could not be FRA recertified—a requirement of his job. Thus, Zaragoza was not a "qualified individual."

# ARGUMENT

## *Standard of Review*

The Court reviews a district court's summary judgment *de novo,* applying the same standard as the district court. *Tagore v. United States*, 735 F.3d 324, 327 (5th Cir. 2013). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Tagore*, 735 F.3d at 328 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "When considering a motion for summary judgment, the court views all facts and evidence in the light most favorable to the non-moving party." *Howell v. Town of Ball*, 827 F.3d 515, 522 (5th Cir. 2016). "Mere conclusory allegations are insufficient to defeat summary judgment." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010).

## I.     The district court properly granted summary judgment finding Zaragoza's ADA claims for disparate treatment and disparate impact are time-barred.

Before filing an action under the ADA, an employee must exhaust their administrative remedies by timely filing a charge of discrimination with the EEOC setting forth the alleged unlawful employment practice. *Melgar v. T.B. Butler Publ'g*

*Co., Inc.*, 931 F.3d 375, 378–79 (5th Cir. 2019); *see also* 42 U.S.C. §§ 2000e-5(b), (e)(1), 12117(a). This is a mandatory precondition to bringing an action in court. *Fort Bend County v. Davis*, 139 S.Ct. 1843, 1846, 1851 (2019). In Texas, the charge must be filed within 300 days of the alleged discriminatory act. *Busari-Ibe v. AGS-AECOM Co.*, No. 4:11-CV-625-Y, 2012 WL 12090207, at *3 (N.D. Tex. Jan. 25, 2012).

Zaragoza was removed from service on April 8, 2016 after failing the Ishihara test and issued permanent restrictions after failing the Light Cannon; but waited years, until March 8, 2020, to file his charge. [ROA.16, ¶ 28; ROA.89-90]. Because Zaragoza failed to file his charge within the prescribed 300-day window, his disparate treatment and disparate impact claims were untimely absent tolling. [ROA.3422-3423]. But the district court correctly found that Zaragoza could not avail himself of tolling based on the *Harris* class action because tolling ceased for his ADA claims on August 17, 2018—the day the *Harris* plaintiffs moved for class certification and removed Zaragoza from the class definition. [ROA.3424]. Zaragoza was required to file his charge of discrimination by June 13, 2019, which he did not. Thus, the district court properly found Zaragoza's disparate treatment and disparate impact claims were time-barred and entered summary judgment in Union Pacific's favor.

A.     *American Pipe* **tolling.**

In *American Pipe & Construction Co. v. Utah*, the Supreme Court held under the posture of that case "at least where class action status has been denied solely because of failure to demonstrate that 'the class is so numerous that joinder of all members is impractical,' the commencement of the original class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." 414 U.S. 538, 552-53 (1974). There was no dispute that the parties whose motions to intervene were denied as untimely under the limitations period were "claimed as members" of the class to which the district court denied certification. *Id.* at 542-44. The Court set forth a rule that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Id.* at 554.

In *Crown, Cork*, the Court elaborated that tolling also applied to class members who "choose to file their own suits" after denial of class certification. *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 353-54 (1983). Like in *American Pipe*, there was no dispute that the plaintiff who chose to file his own lawsuit after denial of class certification was a "member of the asserted class." *Id.* at 347-48.

The Court has since clarified that *American Pipe* tolling is equitable tolling "designed to modify a statutory time bar where its rigid application would create injustice." *Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.,* 582 U.S. 497, 509-10 (2017). "Plaintiffs have no substantive right to bring their claims outside of the statute of limitations. That they may do so, in limited circumstances, is due to a judicially crafted tolling rule that itself does not abridge, enlarge, or modify any substantive right." *China Agritech, Inc. v. Resh,* 138 S.Ct. 1800, 1810 (2018); *see also ANZ Sec.,* 582 U.S. at 509 ("Nothing in the *American Pipe* opinion suggests that the tolling rule it created was mandated by the text of a statute or federal rule. Nor could it have."). Accordingly, *American Pipe* tolling "need not be applied mechanically" and "it should not be applied where doing so would result in an abuse of *American Pipe." Weitzner v. Sanofi Pasteur Inc.,* 909 F.3d 604, 609 (3rd Cir. 2018).

**B.**   ***American Pipe* tolling ceases when named plaintiffs in a class action narrow the class definition.**

For three decades, courts have repeatedly addressed the scenario presently at issue here—what happens to tolling when the named plaintiffs in a class action narrow the class definition? In *Sawtell v. E.I. du Pont de Nemours & Co*., 22 F.3d 248 (10th Cir. 1994), the underlying class action complaints had initially pleaded an expansive class composed of persons who received surgical implants. *Id.* at 253 n.10. In their certification motion, the underlying class plaintiffs then narrowed that

definition; limiting the proposed class only to those who had received implants in Minnesota. *Id.* at 253. But the plaintiff in *Sawtell* was a resident of New Mexico and had her surgery performed in New Mexico. *Id.* Thus, although the plaintiff was a member of the class as originally pleaded, she was not a member of the revised class as defined in the motion for class certification. The Tenth Circuit reasoned this was dispositive:

> The Supreme Court held the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action. Ms. Sawtell would not have been a party to the Minnesota suits had any of them continued as a class action. The statute of limitations should not be tolled.

*Id.* at 253-54.

After *Sawtell*, the Ninth Circuit rejected the argument "that the commencement of a class action suit satisfies the statute of limitations for all those who might subsequently participate in the suit[.]" *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 935-36 (9th Cir. 1996). In doing so, it approvingly cited *Sawtell* for the proposition that "[t]he equitable tolling doctrine only tolls the statute of limitations for asserted class members." *Id.* at 936. Consequently, the Ninth Circuit concluded that the proposed plaintiffs were not "asserted class members" and held that their claims extending the class period were time-barred. *Id.*

The Fourth Circuit in *Smith v. Pennington* also reached the same conclusion as *Sawtell* under similar circumstances:

> We believe that the *Sawtell* court employed the correct rule, and conclude that when a plaintiff moves for class certification by asserting an unambiguous definition of his desired class that is more narrow than is arguably dictated by his complaint, his asserted class for tolling purposes may be limited to that more narrow definition. It then follows that *for parties outside that asserted class, tolling will be unavailable* at least until such time as the plaintiff repudiates that definition of the class he seeks to have certified in a manner that provides adequate notice that his class definition has changed.

352 F.3d 884, 894 (4th Cir. 2003) (emphasis added); *see also In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 293 F.R.D. 483, 487 (S.D.N.Y. 2013) ("[W]hen a consolidated class action complaint redefines a class more narrowly than the prior individual complaints, and no longer asserts claims on behalf of a portion of the consolidated class, the statute of limitations is no longer tolled under *American Pipe* for that 'abandoned' subclass."); *Ganousis v. E.I. du Pont de Nemours & Co.*, 803 F. Supp. 149, 155-56 (N.D. Ill. 1992) (determining that equitable tolling ceased when revised definition in class certification motion excluded plaintiff).

None of these cases are inconsistent with *American Pipe*. And Zaragoza has not cited any cases where the class definition has been narrowed that hold otherwise. To invoke *American Pipe* tolling, a plaintiff must fit within the class that the putative class action sought to certify. *Menominee Indian Tribe of Wis. v. United States*, 577

U.S. 250, 254-58 (2016). A class action must "notif[y] the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment." *American Pipe*, 414 U.S. at 555. Indeed, the Court noted in *American Pipe*, "in certain situations the intervenors may raise issues not presented in the class action complaint and to that extent the defendants will not have received notice of the nature of the claims against them." *Id.* at 555 n.25. Similarly, Justice Powell cautioned that the *American Pipe* rule "should not be read … as leaving a plaintiff free to raise different or peripheral claims[.]" *Crown, Cork & Seal*, 462 U.S. at 354 (Powell, J., concurring).

### C.   Zaragoza was not within the narrowed class on which the *Harris* plaintiffs moved for certification.

The district court correctly concluded that Zaragoza did not fit within the class the *Harris* plaintiffs sought to certify. [ROA.3424-3430]. The *Harris* plaintiffs moved to certify a class of individuals "who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event[.]" [ROA.148]. In doing so, they explicitly acknowledged that the "class definition had been narrowed from the Amended Complaint." [ROA.174, n.5].

To fall within this narrowed class, putative class members were required to have experienced a "reportable health event" as defined by Union Pacific's Medical Rules. [ROA.148; ROA.174]. A "reportable health event" relating to color vision

was defined as "a *new* diagnosis, *recent* event, or *change* in a prior stable condition, for … *significant vision change* in one or both eyes affecting … color vision." [ROA.146 (emphasis added)]. As the district court observed, the *Harris* plaintiffs pleaded this definition of "reportable health event" in their First Amended Complaint. [ROA.106-107]. Moreover, the *Harris* plaintiffs reconfirmed this meaning of "reportable health event" in their briefing supporting class certification, stating: "The fitness-for-duty policy is outlined in Union Pacific's Medical Rules. The rules require employees in so-called 'safety sensitive' positions to disclose new diagnoses, events, or changes in certain conditions, which the company refers to as 'reportable health events.'" [ROA.145-146]. Union Pacific's Medical Rules distinguish between reportable health events and regulatory medical evaluations as being separate circumstances that can trigger a fitness-for-duty evaluation. [ROA.138-140].

Zaragoza was referred for a fitness-for-duty evaluation after failing the Ishihara test during his required FRA recertification—not in response to a "reportable health event." [ROA.16, ¶ 28; ROA.1511]. Moreover, Zaragoza did not claim he failed his most recent Ishihara exams or Light Cannon due to a "reportable health event." [ROA.16, ¶ 29]. Instead, he alleged he worked safely as a conductor for years despite failing the Ishihara test when hired and during his required FRA recertifications in 2010 and 2013—after which he was able to pass Union Pacific's

previous CVFT and become recertified. [ROA.15-16, ¶¶ 25-27]. According to Zaragoza's allegations, the only reason he failed his most recent FRA recertification was because Union Pacific changed its CVFT from the exam he was able to pass to the Light Cannon—not because of a "significant vision change" affecting color vision.

Zaragoza's contention that Union Pacific acknowledges it could discover a reportable health event during an FRA certification exam is not inconsistent with the class definition's requirements. *See* Appellant's Br., pp. 8, 34-35; [ROA.148]. If a regulatory examination revealed an undisclosed reportable health event (that an employee, knowingly or unknowingly, did not report), the discovery of that medical change could trigger a fitness-for-duty evaluation. But in that scenario, the initial fitness-for-duty evaluation because of the regulatory examination still would not be "as a result of a reportable health event"; rather, it is the subsequent fitness-for-duty evaluation of the newly discovered reportable health event that would occur "as a result of a reportable health event."

On appeal, Zaragoza argues that his "failure of the Ishihara test *was* a reportable health event that led the company to believe that he had experienced a vision change—and that was why they [sic] were routed into the fitness-for-duty program." *See* Appellant's Br., pp. 21 (emphasis in original), 34. But this is contrary to Zaragoza's assertion in his opposition to summary judgment that "no change in

condition is required under the reportable health events policy[.]" [ROA.1518]. Zaragoza's new explanation is not properly before this Court. *Montes v. Ransom*, 219 F.App'x 378, 381 (5th Cir. 2007) ("This court will not consider arguments that were not presented to the district court.").

Regardless, Zaragoza's shifting rationale for how he fits within the class definition undermines his position that he meets the definition at all. Indeed, the class definition includes individuals "subject to a fitness-for-duty examination as a result of a reportable health event." *Harris*, 329 F.R.D. at 628. Yet, Zaragoza cannot straightforwardly state how he falls within the definition's plain meaning—and the district court agreed:

> Nor is there any evidence that Zaragoza failed his FRA recertification examination because of a change in his vision. Indeed, Zaragoza's 2016 recertification results essentially resemble his 2010 and 2013 results: he failed the initial Ishihara test, then took Union Pacific's follow-up test. The only noticeable difference between Zaragoza's 2016 results and his previous results is that the 2016 examination involved a Light Cannon test (which Zaragoza failed), while the previous examinations involved a different follow-up test (which Zaragoza passed). *These results suggest a change in testing methods, rather than a change in Zaragoza's vision.*

> Moreover, even if there were evidence that Zaragoza's FFD had *uncovered* a reportable health event, it does not follow that the FFD occurred *as a result of* a reportable health event. Therefore, Zaragoza was not a member of the *Harris* class even assuming his failed Light Cannon test qualified as a reportable health event on its own. Because the certified class only included individuals who were

"subject to [an FFD] examination as a result of a reportable health event," the perception of those reportable health events must have necessarily preceded the FFD examinations. *No known or perceived change in Zaragoza's health prompted his FFD examination, so even if the Light Cannon results revealed a change in Zaragoza's color vision, he would still be excluded from the certified class in* Harris.

[ROA.3426] (emphasis added).

Thus, Zaragoza did not fit within the narrowed class definition stated in the *Harris* certification motion filed on August 17, 2018. Because Zaragoza failed to timely exhaust his disparate treatment and disparate impact claims with the EEOC within 300 days, the district court correctly concluded his claims were time-barred and granted Union Pacific summary judgment. [ROA.3418-3431].

### D.  Zaragoza has not shown that the district court erred.

None of the cases on which Zaragoza relies command a different result. He contends the district court erred in examining whether he fell within the narrowed class definition by relying on *Barryman-Turner v. District of Columbia* for the proposition that *American Pipe* tolling does not "vary based on the individual equities invoked by each former, putative class member." 115 F. Supp. 3d 126, 133 (D.D.C. 2016); Appellant's Br., pp. 31, 36. But, here, the district court did not "consider the criteria of the formal doctrine of equitable tolling"—"[i]t did not analyze, for example, whether the plaintiffs pursued their rights with special care; whether some extraordinary circumstance prevented them from intervening earlier;

or whether defendant engaged in misconduct." *ANZ Sec.*, 582 U.S. at 510; *see also Holland v. Florida*, 560 U.S. 631, 649 (2010). And it was undisputed that the plaintiff in *Barryman-Turner* was a class member. 115 F. Supp. 3d at 131. Thus, *Barryman-Turner* does not address whether it was error for the district court to consider the narrowed class definition in determining that Zaragoza was not "asserted class members." *See In re Syntex Corp.*, 95 F.3d at 936.

Indeed, none of the cases to which Zaragoza cites so hold. In *Bridges*, the court held potential plaintiffs' claims were time-barred because *American Pipe* tolling ended when the district court administratively denied class certification and the named plaintiffs subsequently pursued settlement of their individual claims; meaning the absent class members could not rely on the named plaintiffs to protect their interests. *Bridges v. Dept. of Md. State Police*, 441 F.3d 197, 210-13 (4th Cir. 2006); *see* Appellant's Br., pp. 26, 37. Moreover, *Menhorn* did not involve *American Pipe* tolling; it involved determining when a cause of action accrued for purposes of whether ERISA-preemption applied. *Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496, 1500-01 (9th Cir. 1984); *see* Appellant's Br., p. 23. Similarly, *Arch of Kentucky, Inc.* involved the statue of limitations under the Black Lung Benefits Act, which the court commented "does not exist as a trap for the unwary or unsophisticated miner." *Arch of Ky., Inc. v. Dir., Office of Workers' Comp. Programs*, 556 F.3d 472, 482 (6th Cir. 2009); *see* Appellant's Br., p. 23.

Zaragoza also criticizes the district court for not "pa[ying] attention to what actually happened in *Harris*[.]" *See* Appellant's Br., p. 31. But in opposing summary judgment, Zaragoza was unable to explain how he fell within the narrowed *Harris* class definition. Instead, he cited various portions of the *Harris* record attempting to claim that he and other "color vision plaintiffs" were part of the narrowed class. [ROA.1509-1517]. Zaragoza's arguments were: (1) "the class certification motion in *Harris* did not actually narrow the proposed class;" (2) "even if the *Harris* class definition was narrowed, the new definition still included him" because Union Pacific employs a broader definition of "reportable health event" in practice; and (3) the class certification order cited 9 declarations from plaintiffs with color-vision deficiencies and Zaragoza was one of 7,723 current and former Union Pacific employees to whom the *Harris* court ordered the class certification order be sent. [ROA.1509-1517].

Each of these arguments were explicitly addressed and rejected by the district court in its order granting summary judgment. First, the court rejected Zaragoza's reading of the operative class definition as "facially implausible" because the *Harris* motion for class certification "expressly" stated "the class definition has been narrowed from the Amended Complaint." [ROA.174, n.5; ROA.3388]. Second, the court correctly concluded that, even if Union Pacific employed a broader definition of "reportable health event," Zaragoza was excluded from the *Harris* class because

he did not fail his FRA recertification due to a change in his vision. [ROA.3426, *supra*].

Finally, the court was unpersuaded by Zaragoza's reliance on the declarations of other class members and his inclusion on a list of current and former employees who received notice of the class certification order. Zaragoza contends the declarations of 9 plaintiffs with color vision deficiencies demonstrates that he was a member of the narrowed class. *See* Appellant's Br., pp. 7, 17, 29-30. But the *Harris* court did not analyze whether these 44 declarants were referred for fitness-for-duty evaluation "as a result of a reportable health event" or hold that failing a regulatory exam constituted a "reportable health event." *Harris*, 329 F.R.D. at 624. Nor did the *Harris* court discuss the declarations when considering the commonality to typicality of the class representatives' claims. *Id.* at 623-24. This was emphasized in the district court's order granting summary judgment:

> To be sure, the *Harris* court's description of the declarants as "class members" appears to imply that the declarants were members of the certified class when read in isolation. But this implication conflicts with the plain terms of the class definition. It would be absurd to read the court's passing reference to the declarations as tacitly expanding the class beyond the explicit definition adopted later in the same order

[ROA.3428].

The district court was also unpersuaded by Zaragoza's arguments regarding a purported "class list." Throughout his opening brief, Zaragoza refers to a so-called

"class list;" a spreadsheet of 7,723 current or former Union Pacific employees, including himself. *See* Appellant's Br., pp. 12, 18, 20, 30, 33, 38. According to Zaragoza, Union Pacific had represented that the individuals on the spreadsheet had been subject to a fitness-for-duty evaluation "related to a" reportable health event and that the spreadsheet was the list of class members. *Id.*, p. 11. Not only did Union Pacific not make these representations—it expressly represented that the spreadsheet was over-inclusive.

As Union Pacific explained in its reply supporting summary judgment, the spreadsheet was produced in response to an interrogatory asking Union Pacific to "[i]dentify all employees who have been subject to a fitness-for-duty evaluation since January 1, 2014." [ROA.3403, 3344]. With the spreadsheet's production, Union Pacific's counsel stated: "we are not conceding that any of the employees on the lists we are providing are class members under the class definition as we currently understand it …. In fact, we believe the list is over-inclusive[.]" [ROA.3341, 3344]. Moreover, Union Pacific had repeatedly cautioned that the spreadsheet was not a "class list"—and the proposition that the spreadsheet was a "class list" has been walked back on several occasions. [ROA.3344]; *see Owen v. Union Pac. R.R. Co.*, No. 8:19CV462, 2020 WL 6684504, at *5 n.2 (D. Neb. Nov. 12, 2020), *appeal dismissed*, 2021 WL 1977771 (8th Cir. Feb. 4, 2021). Ultimately, the spreadsheet was not a "class list" as it was created and produced before the

*Harris* motion for class certification narrowed the class definition. [ROA.148-150; ROA.3340-3341]. And while it is true that the *Harris* court ordered a class notice be sent to individuals identified on the spreadsheet, including Zaragoza, the district court correctly found the *Harris* court's use of the spreadsheet did not "represent a finding that all employees on the list were class members." [ROA.3428].

At bottom, Zaragoza never demonstrated he was "subject to a fitness-for-duty examination as a result of a reportable health event[.]" The district court correctly concluded that because Zaragoza was not included in the narrowed class definition, tolling ceased when the *Harris* plaintiffs moved for class certification and Zaragoza's claims were time-barred. [ROA.3418-3431].

## III.    The Court should affirm summary judgment on the other bases on which Union Pacific so moved.

### A.    Standard of review.

This Court "may affirm summary judgment on any ground supported by the record." *Feist v. La., Dep't of Justice, Office of Att'y Gen.,* 730 F.3d 450, 452 (5th Cir. 2013).

### B.    Zaragoza's disparate treatment claim fails as a matter of law.

The ADA prohibits "discrimination against a qualified individual on the basis of disability in regard to job application, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). To withstand a motion for

summary judgment on an ADA claim, a plaintiff must either provide sufficient direct evidence of an employer's discriminatory intent or give rise to an inference of discrimination by satisfying the burden-shifting test from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020).

### 1.   *A fitness-for-duty determination is not direct evidence of discrimination and Zaragoza abandoned the* **McDonnell Douglas** *framework.*

To meet the direct evidence standard, Zaragoza must do more than just showcase differing medical opinions. Evidence of an employer's "subjective intent to discriminate" is "required in a 'disparate-treatment case.'" *Raytheon Co. v. Hernandez*, 540 U.S. 52-53 (2003). This Court recognizes that disparate-treatment claims require "proof and finding of discriminatory motive." *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019) (quotation omitted).

"[D]irect evidence is rare." *Clark*, 952 F.3d at 579 (alternation in original and quotation omitted). Direct evidence in an ADA discrimination case is evidence that, "if believed, it proves the fact of 'discriminatory animus without inference or presumption.'" *Kitchen v. BASF*, 952 F.3d 247, 252 (5th Cir. 2020) (quoting *Rodriguez v. Eli Lily & Co.*, 820 F.3d 759, 765 (5th Cir. 2016)). "Most often, direct evidence takes the form of a discriminatory statement directly connected to the plaintiff's discharge." *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*,

934 F.3d 447, 456 (5th Cir. 2019). "In direct evidence cases, comments must meet a demanding standard because the plaintiff relies on them to prove the entire case of discrimination." *Id.* at 457 (quotation omitted). "A statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action [is] direct evidence of discrimination." *Clark*, 952 F.3d at 579 (quotation omitted).

Here, Zaragoza was denied his FRA recertification and not returned to service because he failed the Light Cannon after failing his initial Ishihara test. Concluding that Zaragoza was ineligible to be recertified under binding FRA regulations is not the same as refusing to return him work due to prejudice against his medical condition. Accordingly, Zaragoza cannot produce direct evidence of discrimination to support his claims. *See, e.g., Clark,* 952 F.3d at 579-82*; Kitchen,* 952 F.3d at 252*; Nall v. BNSF Ry. Co.,* 917 F.3d 335, 339, 341 (5th Cir. 2019)*; Carrillo v. Union Pac. R.R. Co.,* No. EP-21-CV-00026-FM, 2022 WL 3224000, at *4-*5 (W.D. Tex. Aug. 9, 2022).

Zaragoza's opposition to summary judgment made no attempt to prove discriminatory intent or pretext under the *McDonnell Douglas* burden-shifting framework. [ROA.1522-1526, *passim*]. In failing to do so, conceded that he cannot satisfy his burden of proving pretext. *See, e.g., Ervin v. Sprint Communications Co.,* 364 App'x 114, 116 (5th Cir. 2010).

### 2.    *Zaragoza was not qualified under the ADA because he could not satisfy the FRA's mandatory color vision standard for recertification*

A "qualified individual" is one "who, with or without, reasonable accommodation, can perform the essential functions of such position."[3] 29 C.F.R. § 1630.2(m); *see also* 42 U.S.C. § 12111(8); *Gober v. Frankel Family Trust*, 537 Fed. Appx. 518, 521 (5th Cir. 2013). "The term *essential function* means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1) (emphasis in original). "If the disabled person must be exempted from performance of an essential function of the job, then [ ]he is not otherwise qualified and not protected by the ADA." *Jones v. Kerrville State Hosp.*, 142 F.3d 263, 265 (5th Cir. 1998). Under the EEOC's regulations, a qualified individual is one who (1) "satisfies the requisite skills, experience, education and other job-related requirements" of the position; *and* (2) "who, with or without reasonable accommodation, can perform the essential functions of such position." *Id.* (citing 29 C.F.R. Pt. 1630, App. to § 1630.2(m)).

Here, Union Pacific's conductors must be able to discriminate the colors in railroad signal displays and meet FRA color vision standards. Zaragoza cannot

---

[3] Because Zaragoza only argues Union Pacific regarded him as disabled, Union Pacific was not required to provide him reasonable accommodation. *See* 42 U.S.C. § 12201(h); *Cannizaro v. Neiman Marcus, Inc.*, 979 F. Supp. 465, 475 (N.D. Tex. 1997).

demonstrate he was qualified for his position because he failed to obtain his required FRA recertification after failing the Ishihara test and Union Pacific's CVFT. *See, e.g., Anthony v. TRAX Int'l Corp.*, 955 F.3d 1123 (9th Cir. 2020) (employee did not satisfy the prerequisites step of the qualified individual analysis where she did not possess a bachelor's degree required by the government contract covering her job); *Myers v. J.B. Hunt Transport., Inc.*, No. 1:05CV00717, 2006 WL 3479001, at *3 (M.D.N.C. Nov. 30, 2006) ("Mr. Myers may not claim that he was unlawfully denied employment for a position that he was deemed not qualified to perform pursuant to applicable federal regulations.")

> ### a. *Union Pacific meets the* **Albertson's** *defense because it acted under the direction of binding FRA regulations.*

Union Pacific has an absolute defense to an ADA claim if an action is "required or necessitated by another Federal law or regulation." 29 C.F.R. § 1630.15(e); *see Albertson's, Inc. v. Kirkinburg*, 527 U.S. 555, 577-78 (1999). Because Union Pacific's administration of the Ishihara and Light Cannon tests, and subsequent restrictions, were necessitated by FRA regulations, Zaragoza's claims fail as a matter of law.

In *Albertson's*, the plaintiff, a truck driver, was fired for failing to meet certain Department of Transportation ("DOT") vision standards. 527 U.S. at 559. After the driver obtained a DOT waiver of the vision requirement, the employer refused to reinstate him, and the driver sued under the ADA. *Id.* at 560. The Supreme Court

held that the ADA requires individuals who hold jobs subject to DOT physical qualification standards must be able to satisfy those standards to be considered a qualified individual. *Id.* at 573-74 (noting when "Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA as a matter of law"). An employer does not have to justify an applicable regulatory standard because it need not "reinvent the [g]overnment's own wheel." *Id.* at 577. Therefore, if an employer "was entitled to enforce [the DOT's] standard as defining an essential job function[n] of the employment position … that is the end of the case, for [the employee] concededly could not satisfy it." *Id.* at 567. Indeed, without the facts relevant to the driver attaining a waiver—which is not an issue in Zaragoza's case—the Court remarked that his analysis was straightforward:

> It is crucial to [the employer's] position that [it] was not insisting upon a job qualification merely of its own devising, subject to possible questions about genuine appropriateness and justifiable application to an individual for whom some accommodation may be reasonable. The job qualification it was applying was the distant visual acuity standard of the Federal Motor Carrier Safety Regulations…. *The validity of these regulations is unchallenged they have the force of law, and they contain no qualifying language about individualized determinations.*
>
> If we looked no further, *there would be no basis to question [the employer's] unconditional obligation to follow the regulations and its consequent right to do so.* This, indeed, was the understanding of Congress when it enacted the ADA.

*Id.* at 570 (emphasis added).

Applying *Albertson's*, federal courts have unanimously affirmed dismissing employees' claims where a federal regulation required the employer to take an adverse action. *See, e.g., Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 341 (4th Cir. 2022) ("Norfolk Southern's inquiries were compelled by binding FRA regulation, and we cannot fault the company for its efforts to comply with federal law."); *Bey v. City of New York*, 999 F.3d 157, 169 (2d Cir. 2021) ("At bottom, OSHA's regulations are binding [] and prohibit the accommodation that the Firefighters seek. This ends the matter."); *McNelis v. Pa. Power & Light Co.*, 867 F.3d 411, 416-18 (3d. Cir. 2017) ("To the extent McNelis argues he was entitled to more process than that delineated by the NRC regulations, he is again mistaken. While PPL had an "unconditional obligation to follow the regulations," it also had a "*consequent right to do so*") (emphasis in original); *Hawkins v. Schwan's Home Service, Inc.*, 778 F.3d 877, 895 (10th Cir. 2015) (employee who was terminated after failing DOT-mandated medical exam not qualified under the ADA); *Harris v. P.A.M. Transp., Inc.*, 339 F.3d 635, 639 (8th Cir. 2003) (affirming dismissal of ADA claim where the employer "was applying [DOT regulations] to which it was bound.").

And the Fifth Circuit is in accord. *See, e.g., Williams v. JB Hunt Trans. Inc.*, 826 F.3d 806, 811-13 (5th Cir. 2016) (plaintiff not qualified under ADA "[b]ecause he lacked the DOT certification required by federal law"); *Martin v. Lennox Intern.*

*Inc.*, 342 Fed. Appx. 15, 17 (5th Cir. 2009) (plaintiff was not qualified to work as a pilot because he lacked the required FAA certification at the time his employment was terminated).

> **b.    Union Pacific complied with 49 C.F.R. § 242.117(h)(3) in denying Zaragoza's recertification as a conductor and issuing him restrictions.**

*Albertson's* is directly on point, requiring the dismissal of Zaragoza's claim. Union Pacific is legally mandated to comply with the FRA's regulations—the purpose of which is to reduce the rate and number of railroad accidents and injuries by requiring that conductors meet minimum Federal safety standards. *See* 49 C.F.R. § 242.1(a). This includes the requirement that conductors (like Zaragoza) have the ability to recognize and "distinguish between the colors of railroad signals." *Id.* at § 242.117(h)(3). The requirement that conductors must pass an FRA-approved test, including the Ishihara test. *Id*. at Part 242 App. D(4)(3). And the requirement that if a conductor fails that test, Union Pacific must provide the conductor with at least one opportunity to prove they can safely perform as a conductor, such as "Ophthalmologic referral, field testing, or other practical color testing." *Id*.

Union Pacific followed these regulations in denying Zaragoza FRA recertification as a conductor and issuing him restrictions. There is no dispute that Zaragoza failed his Ishihara test and then proceeded to fail the CVFT administered by Union Pacific. *See* SOF ¶¶ 57-60. Therefore, because Zaragoza could not meet

the standards set forth in 49 C.F.R. § 242.117(h)(3), and Union Pacific relied on those standards in denying recertification and in issuing restrictions to Zaragoza, it has an absolute defense to Zaragoza's claims.

### c.   *Zaragoza's attempts to challenge the Light Cannon test fail.*

Zaragoza contests the denial of his FRA recertification based on his failure of the Light Cannon, claiming it was not properly validated and did not accurately measure his ability to see and interpret colored railroad signals because he was able to pass the previous CVFT utilized by Union Pacific. His argument is meritless. The Eighth Circuit has already addressed—and rejected—Zaragoza's argument:

> It is undisputed the [FRA] regulations do not describe how the field test is to be conducted but rather, state that the railroad may exercise its discretion to conduct the [color vision] field test in a manner of its choosing in conjunction with its medical advisor. There is no prescribed methodology for the manner in which a filed [sic] test is to be conducted.

*Brunskill v. Kansas City Southern Ry. Co*., No. 06-00205-CV-W-REL, 2008 WL 413281 at *29 (W.D. Mo. Feb. 12, 2008), *aff'd*, 331 Fed. Appx. 426, 2009 WL 2448265 (8th Cir. 2009). Because the railroad's chief medical officer believed the CVFT administered to the *Brunskill* plaintiff was an appropriate method for measuring his color vision under FRA, the court deemed this sufficient to rebut the plaintiff's ADA discrimination claim where he challenged his failure of the CVFT and resulting denial of FRA recertification. *Id.*; *see also Bower v. Fed. Express*

46

*Corp.*, 156 F. Supp. 2d 678, 686-87 (W.D. Tenn. 2001) (compliance with applicable FAA regulation that gave employer discretion to determine if "it is likely" the employee is unable to perform one or more applicable safety functions to sit in airplane jump seat was an absolute defense to an ADA claim under 29 C.F.R. § 1630.15(e).

Like *Brunskill*, Zaragoza's belief that the Light Cannon was not the most effective way to test his color vision is immaterial. FRA regulations provide that Union Pacific may use a "field test" as opposed to a "scientific screening test" as the "further medical evaluation" used to determine if an individual meets the FRA color vision standards. 49 C.F.R. Part 242 App. D(4); *see also Best Practices for Designing Vision Field Tests for Locomotive Engineers or Conductors*, 80 Fed. Reg. 73,122, at 73,124 (distinguishing between a "'practical test,' more commonly known as a 'field test' within the railroad community, is a test performed outdoors under test conditions that reasonably match actual operating or working conditions" and a "scientific test" which requires "a rigorous scientific study published in a peer-reviewed scientific or medical journal or other publication").

Moreover, Union Pacific's Light Cannon meets the FRA suggestions regarding CVFTs. According to the FRA, "[t]he degree to which a field test's conditions match actual operating conditions determines, to a large extent, its validity." [SER-159]. The Light Cannon test met the suggested criteria by (1) using

signals that were substantially like those being used in the field; (2) conducting the test at a distance that approximates the distance conductors need to be able to recognize signals; (3) removing positional cues (like those present in the previous CVFT); (4) showing a proper number of individual signal lights to the examinee; and (5) used standardized testing protocols to ensure reliability and comparability. [ROA.831-832, 141:16-142:20; ROA.1174-1175, 41:8-42:1, 42:25-43:22].

More importantly, the FRA has expressly concluded that the Light Cannon meets the FRA standards for a valid field test. FRA safety administrators came on site at Union Pacific, evaluated the CVFT in person, and raised no objection to its use. [ROA.787-879, 97:21-98:17; ROA.942-943, 52:5-55:1]. What is more, the FRA's Locomotive Engineer Review Board ("LERB"), which is responsible for reviewing petitions from locomotive engineers appealing a railroad's decision to deny certification for not meeting the color vision standards, has explicitly held that the Light Cannon is a valid field test as contemplated by the FRA regulations.

> Petitioner first asserts that the "light cannon" color vision test is an improper field test, because his 12 years of experience operating a train and medical finding of a "very mild" red/green color vision deficiency demonstrate he can safely operate a locomotive. The Board disagrees. Based on the materials submitted by both Petitioner and UP, the Board finds that the "light cannon" field test is an adequate field test as contemplated by 49 C.F.R. Part 240, Appendix F, paragraph (4).

[ROA.920]. In another decision before the FRA Operating Crew Review Board ("OCRB"), the board that decides conductors' appeals of a railroad's denial of certification, a conductor claimed that the Light Cannon did not properly analyze whether he could operate safely as a conductor. The OCRB rejected the petition; holding "UP's conduct was in accordance with 49 C.F.R. § 242.117 and 49 C.F.R. Part 242, Appendix D." [ROA.927].

Lastly, Zaragoza's years of prior employment as a conductors and passage of the previous CVFT are immaterial. These arguments are directly contrary to the FRA's color vision acuity requirements. Indeed, the Goodwell collision and the responses from the NTSB and FRA illuminate the danger in Zaragoza's argument. *See, e.g., Bey*, 999 F.3d at 161-62, 168 (holding that fire department was not obligated to continue permitting firefighters to wear closely cropped beards because it felt that doing so was not permitted by OSHA regulations). Zaragoza failed to satisfy the FRA's color vision standards necessary for recertification as conductors and engineers. Thus, he was not "qualified" under the ADA and his disparate treatment claim fails as a matter of law.

### C.    Zaragoza's disparate impact claim fails as a matter of law.

Under §12112(b)(6), employers are prohibited from "using qualification standards … that screen out or tend to screen out an individual with a disability … unless the standard, test or other selection criteria … is shown to be job-related and

consistent with business necessity." Here, Zaragoza's claim fails because he (1) cannot establish he was a qualified individual, (2) only alleges that Union Pacific regarded him as disabled, and (3) Union Pacific's color vision screening protocols are job-related and consistent with business necessity.

To succeed on his disparate impact claim, Zaragoza must show he is a qualified individual. *Montgomery v. Union Pac. R.R. Co*., 848 Fed. Appx. 314, 315 n.2 (9th Cir. 2021). Because Zaragoza was not qualified for his position, his claim is precluded as a matter of law.

Moreover, Zaragoza's Complaint only alleges he was disabled under the ADA because Union Pacific "regarded" him as such. [ROA.18, ¶ 43]. While being regarded as disabled can form the basis of an ADA *disparate treatment* claim, the same is not true for an ADA *disparate impact* claim. The ADA and its accompanying regulations specify that employers cannot use selection criteria that screen out individuals "on the basis of [a] disability." 29 C.F.R. § 1630.10(a). Zaragoza is not alleging that he suffered an adverse action because of an actual disability; to the contrary, his theory is that Union Pacific erred in removing him because he has no disability at all.

Finally, "[t]o show a business necessity defense, a defendant must prove by a preponderance of the evidence that its qualification standards are: (1) uniformly applied; (2) job-related for the position in question; (3) consistent with business

necessity; and (4) cannot be met by a person with plaintiff's disability even with a reasonable accommodation."[4] *Atkins v. Salazar*, 677 F.3d 667, 681-82 (5th Cir. 2011). Union Pacific's color vision screening protocol is "job- related for the position in question and is consistent with business necessity" because it is *mandated* by the FRA. *Albertson's*, 527 U.S. at 568 (noting the class of plaintiffs "accepts, as [they] must, that [defendant] may lawfully exclude individuals who fail the DOT test from positions that would require them to drive DOT-regulated vehicles."); *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 996 (9th Cir. 2007) (en banc) (distinguishing between a mandatory DOT safety regulation that an employer need not justify and the defendant's discretionary imposition of the same standard on vehicles to which it does not apply); *Coffey*, 23 F.4th at 332 ("complying with … legally binding federal regulation is, by definition, a business necessity").

Union Pacific is not "insisting upon a job qualification merely of its own devising, subject to possible questions about genuine appropriateness and justifiable application to an individual for whom some accommodation may be reasonable." *Albertson's*, 527 U.S. at 570. Instead, the job qualification Union Pacific applied to Zaragoza is the FRA's requirement that conductors have sufficient color vision acuity to obtain recertification under the FRA—and this requirement is "binding" on

---

[4] An employer is not required to reasonably accommodate an employee who is regarded as disabled. *See* 42 U.S.C. § 12201(h).

Union Pacific. Indeed, multiple circuits have declined "to force a choice [on employers] between the rock of ADA liability and the hard place of regulatory violation." *Coffey*, 23 F.4th at 340; *McNelis*, 867 F.3d at 416 n.2 (refusing to force employer "to pick between ADA liability on one hand and administrative penalties on the other"); *Williams*, 826 F.3d at 811 (declining to make employers "face the dilemma of risking ADA liability or violating the DOT's command"). Because Union Pacific's color vision screening protocols are mandated by federal regulation, they are—as a matter of law—job-related and consistent with business necessity.

## CONCLUSION

For these reasons, Union Pacific requests that this Court affirm the district court's judgment granting summary judgment in Union Pacific's favor.

Date: July 28, 2023

CONSTANGY, BROOKS, SMITH
& PROPHETE, LLP

*/s/ Robert L .Ortbals, Jr.*
Robert L. Ortbals, Jr.
Lara C. de Leon
Katie M. Rhoten

*Attorneys for Appellee*
*Union Pacific Railroad Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 28, 2023, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. All counsel of record are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Robert L. Ortbals, Jr.*
Attorney for Appellee

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5TH CIR. R. 32.1: this document contains 11,934 words.

2.    This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and 5TH CIR. R. 32.1, and the type-style requirements of FED. R. APP. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-size, Times New Roman font.

Dated: July 28, 2023                     */s/ Robert L. Ortbals, Jr.*
                                                    Attorney for Appellee